**TRANSNOR (BERMUDA) LIMITED, Plaintiff,**

v.

**BP NORTH AMERICA PETROLEUM, Conoco Inc., Shell Oil Company, BP Oil International Ltd., Conoco (U.K.) Ltd., Shell U.K. Ltd., Shell International Trading Co., and Exxon Corporation, Defendants.**

**No. 86 Civ. 1493 (WCC).**

United States District Court, S.D. New York.

May 10, 1990.

Edward J. Swan, New York City, for plaintiff.

Davis, Markel & Edwards, New York City, for defendants, Conoco Inc. and Conoco (U.K.) Ltd.; Gregory A. Markel, David Dunn, and Ann Alexander, of counsel.

Sullivan & Cromwell, New York City, for Defendant Exxon Corp.; William E. Willis, James H. Carter, Gandolfo V. DiBlasi, Michael Straus, and William J. Snipes, of counsel.

OPINION AND ORDER

WILLIAM C. CONNER, District Judge.

Defendants Conoco, Inc., Conoco (U.K.) Ltd. and Exxon Corporation move for summary judgment pursuant to Rule 56, Fed.R. Civ.P. on the grounds that the claims of plaintiff Transnor (Bermuda) Ltd. ("Transnor") for losses in the Brent Oil market, allegedly totalling $17 million, and lost profit damages on unrelated businesses, allegedly totalling nearly $65 million[1] are invalid as a matter of law. For the reasons set forth below, defendants' motion is granted in part and denied in part.

SUMMARY JUDGMENT STANDARD

A party seeking summary judgment must demonstrate that "there is no genuine issue as to any material fact." Fed.R. Civ.P. 56(c); *Knight v. U.S. Fire Ins. Co.*, 804 F.2d 9, 11 (2d Cir.1986), *cert. denied*, 480 U.S. 932, 107 S.Ct. 1570, 94 L.Ed.2d 762 (1987); *see Celotex Corp. v. Catrett*, 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). "When the moving party has carried its burden under Rule 56(c), its opponent must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586, 106 S.Ct. 1348, 1355, 89 L.Ed.2d 538 (1986). It must establish that there is a "genuine issue for trial." *Id.* at 587, 106 S.Ct. at 1356. "In considering the motion, the court's responsibility is not to resolve disputed issues of fact but to assess whether there are any factual issues to be tried, while resolving ambiguities and drawing reasonable inferences against the moving party." *Knight* 804 F.2d at 11. The inquiry under a motion for summary judgment is thus the same as that under a motion for a directed verdict: "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law."

---

1. Transnor has withdrawn its claim that it stood to gain $5 million from an arrangement to market, in Iraq, a drag reducing polymer produced by General Technology Applications because it has been unable to amass sufficient evidence to prove the amount of its damages.

**514**

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251–52, 106 S.Ct. 2505, 2512, 91 L.Ed.2d 202 (1986).

### BRENT MARKET CLAIM

In its previous decision denying summary judgment, this Court determined that there were material fact issues as to whether defendants had colluded to trade Brent crude at below-market prices.[2] Only a few additional points need be noted here. This is not a case where plaintiff has failed to segregate the amount of the price decline allegedly caused by defendants' tax spinning from other causes of the price decline.[3] *See e.g. Argus, Inc. v. Eastman Kodak Co.*, 801 F.2d 38 (2d Cir.1986), *cert. denied*, 479 U.S. 1088, 107 S.Ct. 1295, 94 L.Ed.2d 151 (1987) (summary judgment granted because plaintiff failed to refute evidence showing that its lost sales were attributable to independent factors). Transnor's expert witness, Colin Robinson, claims to have considered and discounted other possible explanations for the price decline, including the effect on price of certain OPEC meetings at which there was a discussion of OPEC's intent to increase the supply of oil.[4] It appears that Robinson has examined the effect on Brent market prices of the announcements of OPEC's intent to regain market share, and has drawn colorably reasonable inferences therefrom. The weight to be accorded Robinson's opinion is for the jury to determine.

Once the fact of damages, i.e. injury and causation, is established, plaintiff has a lessened burden of proof in showing the amount of its damages. *See Bigelow v. RKO Radio Pictures, Inc.*, 327 U.S. 251, 264, 66 S.Ct. 574, 579, 90 L.Ed. 652 (1946); *U.S. Football League v. National Football League*, 842 F.2d 1335 (2d Cir.1988). Transnor claims it was prevented from earning $8 million in direct profits from the sale of the two Brent cargoes. This figure derives from profits Transnor estimates it would have made by selling the Brent cargo purchased from Nissho at $25.315 per barrel and the Brent cargo purchased from SITCO at $23.65 per barrel at a market price of $30.75 per barrel, the price Transnor claims it would have obtained absent defendants' alleged market manipulation.[5] In addition, Transnor claims that its direct out-of-pocket losses in the Brent market total approximately $9 million, the combined total of damages Transnor asserts it agreed to pay to Nissho Iwai ("Nissho") and Shell International Trading Company ("SITCO") for defaulting on two December contracts to buy Brent Oil for March delivery.

■ Transnor has presented sufficient evidence from which a jury reasonably could determine the amount of lost profit. In analogous price-fixing cases, the measure of damages is the difference between the actual price paid or received and the price plaintiff would have paid or received in an unmanipulated market, multiplied by the number of units plaintiff bought or sold. *New York v. Hendrickson Bros. Inc.*, 840 F.2d 1065, 1077 (2d Cir.1988), *cert.*

---

**2.** The relevant facts and background information are set forth in an Opinion and Order dated April 18, 1990, familiarity with which is assumed. 738 F.Supp. 1472.

**3.** Transnor effectively refutes defendants' contention that it fails to separate out "lawful" tax spinning from "unlawful" tax spinning, as Transnor claims that all of defendants' tax spinning was unlawful in that it was pursuant to a conspiracy to manipulate market prices.

**4.** Transnor's claim does not fail, as defendants assert, because Robinson concedes that the price fall to $23 by January 9, 1986 likely was not caused by defendants. Defendants' argument that, absent any tax spinning, Transnor would have lost money on the relevant cargoes assumes that Transnor would have liquidated its position on January 9, 1986. Transnor's position that it would have waited to see if prices recovered, and that the market price in mid-March would have been enabled Transnor to earn a profit on these Brent contracts, presents sufficient material issues of fact whether Transnor would have earned profit "but for" the defendants' conduct.

**5.** Since Transnor never actually paid for the goods it contracted to buy or received money on the resale of those goods because it defaulted on its contracts to buy oil, this court finds it useful to consider damages from lost profits on the Brent sales separately from damages stemming from the breaches of contract.

*denied,* — U.S. ——, 109 S.Ct. 128, 102 L.Ed.2d 101 (1989); *Ohio Valley Elec. Corp. v. General Elec. Co.,* 244 F.Supp. 914, 933 (S.D.N.Y.1965). One difficulty in such an evaluation lies in establishing what the market price would have been in an unmanipulated market. "Where, however, there is a dearth of market information unaffected by the collusive action of the defendants, the plaintiff's burden of proving damages is, to an extent, lightened, for 'it would be a perversion of fundamental principles of justice to deny all relief to the injured person, and thereby relieve the wrongdoer from making any amend for his acts.'" *Hendrickson,* 840 F.2d at 1077 (quoting *Story Parchment Co. v. Paterson Parchment Paper Co.,* 282 U.S. 555, 563, 51 S.Ct. 248, 250, 75 L.Ed. 544 (1931); *see also J. Truett Payne Co. v. Chrysler Motors Corp.,* 451 U.S. 557, 566, 101 S.Ct. 1923, 1929, 68 L.Ed.2d 442 (1971) (some measure of uncertainty tolerated because of difficulty in ascertaining "what plaintiff's situation would have been in the absence of the defendant's antitrust violation."). As the Second Circuit Court stated in *United States Football League,* 842 F.2d at 1379, when the defendant's wrongful conduct has been shown to cause plaintiff to be damaged in an uncertain amount, the defendant bears the risks of that uncertainty. While damages may not be determined based on speculation or guesswork, the plaintiff need not prove its damages with mathematical precision. *Zenith Radio Corp. v. Hazeltine Research, Inc.,* 395 U.S. 100, 124, 89 S.Ct. 1562, 1577, 23 L.Ed.2d 129 (1969). An antitrust plaintiff need only provide sufficient evidence to support a "just and reasonable" damage estimate. *Id.* at 123–24, 89 S.Ct. at 1576–77; *Bigelow,* 327 U.S. at 264–65, 66 S.Ct. at 579–80.

In *Strobl v. New York Mercantile Exchange,* 582 F.Supp. 770 (S.D.N.Y.1984), *aff'd,* 768 F.2d 22 (2d Cir.), *cert. denied,* 474 U.S. 1006, 106 S.Ct. 527, 88 L.Ed.2d 459 (1985), a case involving the downward price manipulation on the potato futures market, the court rejected defendant's motion for judgment notwithstanding the verdict because the court found that the jury could have determined damages based primarily on expert testimony as to what the market price would have been absent the manipulation, based on market prices two years earlier, under generally similar market circumstances, although with somewhat different demand/supply factors. In the case at bar, Robinson has provided an expert opinion, not only segregating the causes of the price decline, but comparing prices during and after the period of the alleged conspiracy as well. *See Ohio Valley Elec. Corp.,* 244 F.Supp. 914 (plaintiff compared prices before, during and after price-fixing conspiracy to show damages caused thereby). Robinson explains that he does not find that standard statistical analysis aids in this analysis, so he examines price information on the basis of subperiods. For example, Robinson examines prices between April 15 and early June, 1986 when the incentive for tax spinning was allegedly absent, as well as prices between June and late August. Robinson's method thus comports with methods used by experts in other price-fixing cases and it is the jury's function to assess the weight of his testimony.

Defendants assert that Transnor's claim for $9 million in breach of contract damages is impermissibly speculative as a matter of law because Transnor's obligation to pay the breach of contract damages is dependent upon the outcome of the instant lawsuit. *See Zenith Radio Corp v. Hazeltine Research, Inc.,* 401 U.S. 321, 339, 91 S.Ct. 795, 806, 28 L.Ed.2d 77 (1971) (future damages not recoverable if the fact of their accrual is speculative). The issue presented is whether these damages are past damages which have fully accrued or future damages which have not yet accrued.

At the time of its default, Transnor incurred potential liabilities to SITCO and Nissho by virtue of its breach of two contracts to buy Brent oil. This does not mean, however, that Transnor will actually discharge these liabilities so that they may become elements of the damages in this case. While this Court does not dispute Transnor's proposition that damages are determined at the time they are sustained,

the existence of potential liabilities does not automatically translate into actual damages suffered.

■ Transnor instituted the present action on or about February 29, 1986. On May 15, 1987, SITCO obtained a judgment in Bermuda against Transnor in the amount of $5,383,693, the full amount SITCO lost from Transnor's default. Thus, Transnor has incurred a definite liability to SITCO and, by the same token, suffered damages in the amount of that judgment. Transnor and SITCO, an alleged co-conspirator in the present case, thereafter signed a June 13, 1988 agreement, providing that in exchange for Transnor's dismissing its claims against SITCO in the present case, Transnor could delay payment of the $5,383,693 until Transnor's total proceeds from any source exceeded $20 million. This Court rejects defendants' argument that this settlement agreement allows Transnor to recover damages which are contingent upon the result in this case. That Transnor's obligation to pay under the settlement agreement does not accrue unless its recovery against the remaining defendants exceeds $20 million does not mean that no damages were sustained. The price which Transnor paid for the deferred accrual was to forgo its claim against SITCO as an alleged co-conspirator, in addition to assigning to SITCO any recovery between $20 million and $25,383,693.

■ As to Transnor's contract to buy Brent Oil from Nissho, the only indication of any liability of Transnor thereon is a telegram from Nissho dated February 24, 1986 in which Nissho informed Transnor of its intent to hold Transnor liable. Transnor argues that Nissho agreed to postpone Transnor's "obligation" to pay its $5 million debt until this litigation is completed in a September 1988 unsigned written agreement. Examination of the agreement, however, shows that it specifies certain conditions precedent which must be fulfilled before the agreement takes effect. For example, the agreement requires Transnor's directors to approve and affix Transnor's seal to the agreement along with the signature of two of Transnor's directors. Transnor's shareholders are also required to hold a special shareholder meeting and unanimously pass a "ratification resolution." Transnor presents no evidence that any of the conditions precedent were fulfilled, and the missing signatures suggest that they were not. While Nissho may believe Transnor owes it money, and Transnor may also believe it, see Plaintiff's Surreply Memorandum of Law in Opposition to Defendants' Motion for Summary Judgment on Damage Issues at 16, Transnor has suffered no damages at this point, except for the $1,080,000 already paid to Nissho as partial payment of the debt running from its default.

Transnor's reliance on *Minpeco, S.A. v. Hunt,* 718 F.Supp. 168 (S.D.N.Y.1989), for the proposition that the Nissho agreement is irrelevant to the damages in this suit is misplaced. In *Minpeco,* the district court rejected the defendants' argument that the plaintiff's judgment should be reduced, before trebling, by the amount of the plaintiff's loan that was assumed by the state of Peru, since it was part of the plaintiff's claimed loss. The Court reasoned that:

> Reduction of the damages to reflect Peru's assumption of the loan would fail to hold the defendants responsible for the losses they caused [plaintiff] and permit them to escape liability for their acts because others chose to or had to aid the injured party.

*Id.* at 183. Transnor argues that Peru's assumption of the loan does not differ significantly from Nissho's agreement to extend Transnor's time to pay the sums owed on account of Transnor's breach of contract. However, Minpeco's loans obtained to cover margin calls and to close forward and futures positions were clearly an existing damage suffered, unlike the present situation where Nissho has neither obtained a judgment against Transnor nor obtained full payment from Transnor for its breach of contract. Since *Minpeco* becomes relevant only after actual damages are shown, its holding is of no assistance to Transnor at present.

This does not mean that Transnor can never recover the Nissho damages. In *Ze-*

*nith,* 401 U.S. 321, 91 S.Ct. 795, the Supreme Court explained that holding future damages too speculative is equivalent to holding that a cause of action has not yet accrued. Once a cause of action accrues, the plaintiff can then bring suit within the statute of limitations. Thus, if Nissho obtains a judgment or Transnor pays the breach of contract damages, damages will have accrued and Transnor can sue for recovery.

## OTHER LOST PROFIT CLAIMS

 An antitrust plaintiff must show damages stemming from an injury to its business or property in order to have standing under the antitrust laws. *See* Section 4 of the Clayton Act, 15 U.S.C. § 15 (1970 & 1990 Supp.); *Grumman Corp. v. LTV Corp.,* 665 F.2d 10 (2d Cir.1981), *Solinger v. A & M Records, Inc.,* 586 F.2d 1304 (9th Cir.1978), *cert. denied,* 441 U.S. 908, 99 S.Ct. 1999, 60 L.Ed.2d 377 (1979). A plaintiff's valid contract constitutes property within the meaning of the Clayton Act. *See Waldron v. British Petroleum Co.,* 231 F.Supp. 72, 81–82 (S.D.N.Y.1964). When a plaintiff claims an injury to business due to lost profits from a business in which it was not an active participant at the time of the alleged violation, it must demonstrate an intention and preparation to engage in the business. Courts have assessed whether a plaintiff has shown the necessary intent and preparation by examination of the following factors: 1) the background and experience of plaintiff in the prospective business; 2) affirmative acts of plaintiff with the object of entering the proposed business; 3) the ability of plaintiff to finance operation of the business and the purchase of necessary equipment and facilities; and 4) the formation of contracts by plaintiff. *Id.; Indium Corp. of America v. Semi–Alloys, Inc.,* 611 F.Supp. 379 (N.D.N.Y.), *aff'd,* 781 F.2d 879 (Fed.Cir.1985), *cert. denied,* 479 U.S. 820, 107 S.Ct. 84, 93 L.Ed.2d 37 (1986). The presence or absence of any one criteria is not determinative.[6] Transnor claims that defendants' Brent market actions placed Transnor in a financial position where it could no longer do business and Transnor therefore suffered injury to business or property in the following areas.

### Barter Crude Transactions

 Transnor alleges that it had an agreement with ENKA, a Turkish construction company, to market $300 million worth of "barter crude"[7] that ENKA was to receive from Libya in exchange for services performed there. Transnor claims that it reached an oral agreement with ENKA at a meeting on or about September 21, 1984, attended by E. Roy Moor and Alexander Georgiadis of Transnor, Lloyd Thorsen, a friend of Mr. Georgiadis, and several ENKA officials, including Temiz Ustun. At this meeting, Ustun allegedly announced that he wanted Transnor to market the entire amount of barter crude as it became available until the $300 million debt was amortized. Defendants contend that no such blanket contract was reached, but that Transnor and ENKA instead entered into two separate contracts for individual cargoes, neither of which was consummated.[8]

Even if, as Transnor alleges, a $3 million contract existed with ENKA, there has been no showing that ENKA had any barter crude available at any relevant time. Transnor fails to offer evidence refuting the deposition testimony of one of its principal traders that he did not know if ENKA

---

6. The cases cited by defendants do not support the proposition that a plaintiff faces a higher burden in showing its intent and preparedness to enter a business when a firm contract is lacking. In one of cases referred to, *Parks v. Watson,* 716 F.2d 646 (9th Cir.1983), the court denied summary judgment despite the absence of a firm contract.

7. Barter crude is crude oil used instead of currency to pay obligations.

8. In October 1985, Transnor's negotiation of the sale of a single cargo fell through when Transnor was unable to provide ENKA with a bank's confirmation of a letter of credit provided by the buyer of the oil. Arrangements for a second cargo, in January 1985, were not consummated because the Libyans were not ready to deliver the oil.

had any barter crude available after 1985, when defendants' alleged conspiracy began operation. Furthermore, Transnor admits that the spread between the official sales price of Libyan Oil and the market price beginning in 1985 made barter transactions "not attractive." Since no evidence has been provided either that ENKA possessed barter crude oil to sell, or, if barter crude had been available, that Transnor would have been able to market it at a profit, Transnor cannot attribute any lost profits under the alleged contract to defendants' actions on the Brent Market.[9] Summary judgment is accordingly granted as to this $3 million claim for damages.

Transnor further asserts that other countries and companies would have had barter crude to sell from which Transnor could have profited. However, Transnor provides no evidence that it took any steps to explore or attempt to negotiate barter crude transactions with anyone other than ENKA. Transnor's last direct contact with ENKA took place in January 1985 and Transnor admits that direct contact after this point was unnecessary because marketing ENKA crude would have been unprofitable in 1985. Thus, while Transnor may initially have intended to enter the business of selling barter crude by transacting with ENKA, it is clear that by January 1985, when there was no foreseeable prospect of earning profits with ENKA, Transnor abandoned any attempt to engage in barter crude transactions. Under the circumstances, Transnor "may not recover lost profits by projecting a course of business [it] deliberately didn't pursue." *See Grip–Pak, Inc. v. Illinois Tool Works, Inc.*, 651 F.Supp. 1482, 1504 (N.D.Ill.1986); *Indium Corp.*, 611 F.Supp. at 386. Because Transnor was not prepared to engage in the business of barter crude oil trading at the time defendants allegedly injured Transnor, Transnor cannot show an injury to business sufficient to provide standing under the antitrust laws.

**SOMO**

In September of 1985, representatives of Transnor and the State Oil Marketing Organization of Iraq ("SOMO") met and drafted an agreement for the purchase of 25,000 barrels per day of Basrah Light, a grade of Iraqi crude oil, for the period of one year beginning December 1, 1986, with an option for either party to cancel its obligation after three months plus a phase-out period. The parties agree that the written contract provided that "[t]he destination of the crude oil sold under this contract shall be Singapore ..."

After the contract was entered into, Transnor contracted with Nissho on January 17, 1986 to sell the approximate equivalent of its first two liftings from SOMO for delivery to India. Transnor sent SOMO a nomination telex conveying this information. SOMO wired back the next day that the destination had to be Singapore, and wired, the day after, that Transnor's action was "not in accordance with the contractual agreement." SOMO refused Transnor's repeated requests for approval of the India destination and SOMO suggested that Transnor withdraw its nomination of the first two liftings. Transnor agreed to withdraw the liftings, although it threatened to sue SOMO for any resulting loss. Transnor then paid Nissho $230,000 for its resulting breach of contract.

Defendants claim that SOMO would not have continued to supply oil to Transnor because it breached a material term of the contract. In his affidavit, SOMO's president, Dr. Ramzi Salman Hussain states "contrary to the expressed terms of the contract that 'the destination of the crude oil sold ... shall be Singapore,' Transnor nominated Bombay, Republic of India as the destination for the first cargo."

██ Transnor claims that it did not breach the contract because a prior oral understanding for free destination superseded the written agreement. Transnor ar-

---

**9.** Transnor's citation to *Waldron,* 231 F.Supp. at 86, for the proposition that the value of a contract raises an issue of fact precluding summary judgment is misplaced. In *Waldron,* the plaintiff asserted that the contract at issue possessed value. Transnor cannot recover damages without presenting some evidence to rebut defendants' assertion that the contract was without value because no oil existed at that time.

gues that Arab boycott countries frequently insert specific destination provisions for the sake of appearance only, and in previous dealings with Moor, Ramzi had allowed delivery of oil to free destinations despite the existence of destination clauses. Transnor claims that Ramzi told Moor and John Corp of Transnor that the contract was free destination, despite the written clause. Transnor argues that SOMO's objection to the India destination does not contradict this position, as it stemmed from objections peculiar to India at that time, not to free destination generally. Transnor also claims that although the contract was for one year, the parties expressly understood that it would be self-renewing or "evergreen." Defendants challenge the testimony as to what Ramzi allegedly said as inadmissible hearsay and further argue that evidence of oral contract terms contradicting the written contract is inadmissible parol evidence.[10]

Transnor claims that because Transnor and SOMO did not intend the contract to be fully integrated, the parol evidence rule is inapplicable. The parol evidence rule only applies to written instruments which constitute a complete expression of the parties' agreement and extrinsic evidence bearing on this threshold issue is admissible. *American Anodco, Inc. v. Reynolds Metals Co.*, 743 F.2d 417, 422 (6th Cir.1984). Whether a writing was intended as an integration may be proved by any relevant evidence. Restatement (Second) of Contracts, § 209 comment c (1981).

In New York, a contract which appears complete on its face is integrated as a matter of law. *Battery S.S. Corp. v. Refineria Panama, S.A.*, 513 F.2d 735, 739 (2d Cir.1975); *Higgs v. De Maziroff*, 263 N.Y. 473, 189 N.E. 555 (1934). The two-page contract between Transnor and SOMO contains all material terms, but because it is unsigned and undated, the Court has considered evidence extrinsic to the contract in determining whether it is integrated. Based on this analysis, the Court finds that the written contract is integrated and that evidence of oral terms contradicting the writing is inadmissible.

Shortly after the September meeting at which the contract was drafted, Transnor wrote to SOMO stating that Transnor was fully prepared to conclude the contract but questioned the Singapore destination clause. SOMO responded by telex dated October 29, 1985 that "our understanding is that all crude will be destined to Singapore and that names of refineries in which crude will be processed have to be stipulated in [the] contract." Transnor wired back that the name of the refinery was the Singapore Refining Company. SOMO wired back in pertinent part:

> we are pleased to confirm our agreement to terms and conditions of 25000 B/D Basrah Light as per draft contract discussed on Sept., 29th. 1985. Your telex above shall be regarded as an integral part of the contract.

This correspondence shows that the parties specifically debated and subsequently reached agreement on the destination clause.[11] Transnor's attempts thereafter to modify the contract were not accepted by SOMO and do not change the nature of the contract. Furthermore, Transnor's claim of an oral understanding contradicting the written agreement is inconsistent with Transnor's January 28, 1986 letter, in which Transnor asked SOMO's permission to send the oil to India. If the parties had agreed on free destination, Transnor would not need such approval. Finally, this Court notes that Transnor did not sue SOMO on the basis of an alleged oral agreement contradicting the written contract, despite the

---

**10.** The parol evidence rule, a rule of substantive, not evidentiary law, *see Garza v. Marine Transport Lines, Inc.*, 861 F.2d 23, 26–27 (2d Cir.1988), requires choice of law analysis. Neither party identifies what law is applicable to a contract between a Bermuda corporation and an Iraq state organization. This Court therefore applies New York law.

**11.** Moor's claim that he personally consummated several oil deals with Ramzi in which the contract specified one destination and delivery was allowed to another does not alter this Court's conclusion that the contract at issue was fully integrated.

fact it paid Nissho damages for its breach of contract.

◼ The parol evidence rule seeks to avoid the possibility that fraud may be perpetrated if testimony as to alleged oral understandings could be substituted for the plain meaning of a contract. *See Garza*, 861 F.2d at 26–27. Transnor's claim that SOMO orally agreed to free destination despite the existence of a specifically negotiated clause in an integrated contract is precisely the type of evidence excluded by the parol evidence rule.

While it is therefore clear that Transnor breached the contract, it is less clear that SOMO would have refused to continue to supply crude oil to Transnor under the terms of the contract. In his affidavit, Hussain states that "because of Transnor's breach ... SOMO would have been unwilling to continue to supply crude oil to Transnor." However, a telex from SOMO to Transnor sent after Transnor withdrew its first two liftings suggested that the parties meet to discuss the future of the contract. Transnor argues that its failure to respond, which caused the contract to lapse, was due to its Brent market losses, allegedly caused by defendants, which placed it in such financial straits that it could no longer purchase the oil. Thus, there are material issues of fact whether SOMO would have continued to supply oil to Transnor under the terms of the contract if Transnor had not suffered its Brent market losses.

◼ This Court finds as a matter of law, however, that Transnor cannot prove that it would have profited from further purchases under the contract. Corp has admitted that Singapore was an unprofitable destination in September 1985 and that "it seemed unlikely that the economics would ever favor refining in Singapore." In its papers submitted in opposition to this motion, Transnor spends considerable time arguing that whether it would have earned a profit in Singapore is irrelevant because Transnor was not limited to the Singapore destination, an argument which this Court rejects in light of the written contract. Transnor has failed to establish any damages based on a contract containing the

Singapore destination clause. Transnor claims that Singapore was an unprofitable destination only when the oil was being refined for Transnor's own account and not when it was resold to third parties, and that it would be profitable to refine the oil for Transnor's own account when the price of crude was low, or the demand for refined crude products was high. Transnor provides no evidence that either of these market conditions existed at any time relevant to this action. Furthermore, Transnor provides no estimate of the profits it would have earned if limited to the Singapore destination. In light of these factors, this Court finds no difficulty in ruling that Transnor fails to present material facts upon which a "just and reasonable" estimate of its damages with respect to the SOMO contract could be based.

*Kenya*

◼ In May 1985, Transnor met with representatives of the Kenyan government and submitted a study it had made of Kenyan oil importing patterns based on material gathered from a ten-day Kenyan trip in April 1985, made at the request of Kenyan Oil Minister Nicholas Biwott. The study concluded that Kenya paid overly high prices for its oil imports and suggested that the National Oil Corporation of Kenya ("NOCK") assume responsibility for 30% of Kenya's crude oil imports. Transnor claims that, at a meeting some months after May 1985 at which Biwott, Moor, and Alexander Georgiadis were present, Biwott orally promised Transnor the exclusive right to supply at least 15,000 barrels a day of Kenya's crude oil, which amounted to 30% of their crude oil requirements. Biwott allegedly referred to this arrangement on other occasions. Both parties agree that the documentary record, consisting of telexes from a NOCK representative and a variety of unsigned contracts submitted by Transnor with varying terms, reveals only an invitation to bid.

Despite the documentary evidence, Transnor maintains that it had a firm contract in place. Transnor argues that the telexes were merely a sham to create the

appearance of competitive bidding in order for Biwott to avoid charges of favoritism and because the deal ultimately needed approval from the Kenyan government.[12] Transnor claims that NOCK's delay in restructuring the deal with its marketers [13] delayed the starting date of the contract.

The existence of this contract is suspect because in 1987 Transnor's traders and financial backers, operating under the name Northern Transport and Trading Company ("Northern Transport"), failed in their attempt to conclude a spot oil deal with Kenya. Transnor claims that in its original alleged contract with Biwott, the parties agreed to agree on price when the time came. However, the Northern Transport deal collapsed because Kenya found Northern Transport's price too high and awarded the contact to a different oil company. Despite Transnor's protestations that Kenya would accept its oil prices if this had been the term deal envisioned in the contract, it certainly suggests that the bid process was a competitive one and that no oral contract existed.

More importantly, assuming the truth of Transnor's allegation of a contract, the contract appears to have involved a form of bid rigging intended to prevent actual competition in an apparent attempt to deceive the Kenyan government. Such a contract would be a species of fraud violative of public policy and would be clearly unenforceable under U.S. law. *See Wade v. Ingram*, 528 F.Supp. 495 (E.D.Ark.1981); *Premier Elec. Const. Co. v. Miller–Davis Co.*, 292 F.Supp 213 (N.D.Ill.1968), *rev'd other grounds*, 422 F.2d 1132 (7th Cir.), *cert. denied*, 400 U.S. 828, 91 S.Ct. 56, 27 L.Ed.2d 58 (1970). Therefore, even assuming the Kenyan contract was as Transnor says it was, this Court cannot award dam-

ages based on the failure of such a contract to be consummated. Since Transnor bases its claim that it intended and was prepared to enter the business of importing oil to Kenya on this alleged contract, summary judgment is granted on this claim.

### Nissho and Other Traders

Transnor claims that its "close business relationship" with Nissho through Corp's friendship with one of Nissho's chief oil traders would have permitted Transnor to trade approximately 20,000 barrels of oil per day with Nissho for three years at a profit of $.50 per barrel. Transnor also calculates that it lost $7 million in profits from deals it would have otherwise concluded with other oil traders and producers.[14]

Transnor had financed its previous oil deals with money provided by members of the Georgiadis family, two of whom were Transnor directors. According to Antony Georgiadis, "as long as things looked good and optimistic," Transnor's financial backers were willing to provide Transnor with funds. Georgiadis stated that these unidentified family members were no longer willing to provide Transnor with financial backing once it became a $12 million judgment creditor after it defaulted on the Brent contracts. Georgiadis further asserted that because Transnor was a judgment debtor, it could not have obtained the necessary letters of credit in order to do business.

First, this Court notes that the only evidence provided of a judgment entered against Transnor is the $5 million judgment obtained by SITCO. The discrepancy in amount, however, is ultimately unimportant as Transnor has not convincingly ex-

---

**12.** Transnor concedes that Biwott lacked final authority to conclude the deal because the Central Bank of Kenya needed to approve any purchase necessitating an outward flow of foreign currency from Kenya, but contends that Biwott's influence was such that Transnor would get the necessary approval.

**13.** The marketers were a group of oil companies to which NOCK had contracted away the right to import crude oil to Kenya. An alternative agreement with the marketers was necessary

before NOCK could import from another group. In 1988, NOCK, apparently having reached an agreement with the marketers, entered into an arrangement with Neste, a non-marketing company, to import crude oil.

**14.** This profit figure is based on trades made directly with the third party, thus, Transnor does not double-count the trades where Nissho would have act as an intermediary to facilitate the transaction.

plained why it could not continue to conduct business, despite its Brent market losses. Transnor did not enter bankruptcy or liquidation proceedings after its default on the two Brent contracts or its Brent market losses. The Court has been informed that Corp and Moor are still employed by Transnor, although Transnor is not currently involved in oil trading.

The Northern Transport deal with NOCK, although never consummated, shows that when there was a possibility of earning a profit from an oil transaction, the Georgiadis family was willing to proceed. Procuring a letter of credit was not an obstacle to the contract, as demonstrated by Northern Transport's use of a letter of credit procured by the end purchaser as collateral for Northern Transport's letter of credit. Northern Transport and Transnor had the same financial backers, traders and principals. The Northern Transport agreement with NOCK was even printed on Transnor's letterhead.

Furthermore, it appears that Antony Georgiadis never even asked the other members of the Georgiadis family for money to pay SITCO's and Nissho's claims against Transnor because "[h]ow could I possibly ask them for money when I felt that we were no longer in a position to conduct business." Georgiadis' testimony implies that Transnor's financial backers had the necessary funds to engage in oil trading, but did not wish to pay Transnor's debt in order to allow it to obtain the necessary letters of credit to do business and Transnor has provided no evidence otherwise. It is not unheard of for investors in a company to pay off the company's debts in order to allow it to continue business. Transnor's own expert witness, Edwin Spuller, while testifying as to the volatility of the Brent market, referred to a company, twice in danger of bankruptcy, which had been "saved" by investors who refinanced the company, thereby allowing the company to pay its debt and continue trading. Finally, given Corp's and Moor's pre-Transnor trading record, Transnor also should have been able to find sources of money outside the Georgiadis family if there were potentially profitable trades to

be made. No evidence was provided that Transnor ever inquired into other sources of funds.

The Court finds that Transnor failed to mitigate its damages by not paying the $5 million debt in order to continue oil trading. Defendants should not be liable for $7 million in lost profits which Transnor contends it would have earned when there is no evidence that Transnor's backers could not pay Transnor's debt and allow it to engage in profitable future trades. Since Transnor has provided no proof that Transnor's backers were financially unable to pay Transnor's losses, but merely that they were unwilling to do so, responsibility for the lost profits rests with Transnor. Thus, summary judgment is granted on Transnor's claim for lost profits from transactions it would have entered into with Nissho and with other traders.

## COMMODITIES CLAIMS

■■■ Defendants assert that Transnor's "collateral" damage claims, i.e. its claims for losses outside the Brent market, are not cognizable under the Commodities Exchange Act ("CEA"), 7 U.S.C. §§ 1 et seq. (1980 & 1989 Supp.). The 1982 amendments to the CEA, which authorized private causes of action, limit a plaintiff's recovery to "actual damages." 7 U.S.C. § 25 (1983). The requirement that a plaintiff must show that the violation has "arisen from a transaction on the futures market," H.R.Rep. No. 565, 97th Cong., 2d Sess. at 57, U.S.Code Cong. & Admin.News 1982, pp. 3871, 3906, is met as Transnor alleges that defendants' price manipulation occurred on the Brent market, which this Court has previously held to be a futures market.

Defendants rely on the Report accompanying the 1982 amendments in support of their assertion. The accompanying report provides:

The Committee included these restrictions on the causes of action to avoid suits for speculative damages to assets that are affected by fluctuations in prices on the commodity market but

which are not the subject of transactions on such market.

H.R.Rep. No. 565, 97th Cong., 2d Sess. at 57, U.S.Code Cong. & Admin.News 1982, at 3906.[15] It is clear from this report that the "actual damages" provision was added to limit a plaintiff's recovery to damages to assets which are traded on a commodities market. Transnor's claim that the restriction is not in terms of whether the asset is traded on the futures market, but whether the damages to other assets are speculative is not persuasive as a plaintiff can never recover speculative damages, whether on a futures market or otherwise.

The legislative history of the 1982 amendments dealing with the "actual damages" language, although sparse, suggests that Congress added that language to prevent the CEA from being used to recover damages not suffered directly on the commodities market. This Court finds that the CEA limits a plaintiff's recovery to damages to assets that are part of a futures market. Thus, only Transnor's claim of direct loss on its Brent transactions and its claim that it was precluded in engaging in Brent trading after February 1986 are compensable under the CEA.

Defendants' arguments that Transnor has not established a causal nexus between defendants' alleged CEA violations and its purported injury and that Transnor's damage claims under the CEA are speculative and therefore fail as a matter of law are rejected for the same reasons stated in connection with these claims under the antitrust portion of this motion.

## CONCLUSION

For the above-stated reasons, summary judgment is granted with respect to Transnor's claim for damages based on lost profits from the barter crude transactions, the SOMO transactions, the NOCK transactions, the Nissho and "other traders" transactions and for moneys owed to Nissho by virtue of Transnor's breach of contract to buy Brent oil. Transnor's claim for damages under the CEA is limited to damages suffered on the Brent market. Summary judgment is denied in all other respects.

SO ORDERED.

---

**15.** The subcommittee explained that the private right of action essentially would, "authorize private rights of action by market participants but not by members of the public who did not participate in the market and claimed to be injured in their commercial transactions by declines in commodities prices." *Id.* at 145.