**THREE CROWN LIMITED PARTNERSHIP, Three Crown Capital Partners and Meadowlands Fund, L.P., Plaintiffs,**

v.

**SALOMON BROTHERS, INC., Paul Mozer, Steinhardt Management Company, Inc., Steinhardt Partners, L.P., SP Investors International N.V., Michael Steinhardt, Ernest Theurer, George Soros, Individuals and d/b/a Soros Fund Management, Quantum Fund N.V., Quasar International Partners C.V., Caxton Corporation, Bruce Kovner, Luttrell Capital Management and D. Scott Luttrell, Defendants.**

No. 92 Civ. 3142 (RPP).

United States District Court,
S.D. New York.

Oct. 19, 1995.

Richards & O'Neil, L.L.P., New York City by Kenneth I. Schacter and Patricia K. Lang, for Plaintiffs.

Cadwalader, Wickersham & Taft, New York City by Richard J. Wiener, Haven Roosevelt, and Gary M. Rosen, for Defendant Caxton Corporation.

Lankler, Siffert & Wohl, New York City by Frank H. Wohl and Susan L. Sommer, for Defendant Bruce Kovner.

Zuckerman, Spaeder, Goldstein, Taylor & Kolker, New York City by Lisa A. Cahill, for Defendant D. Scott Luttrell and Luttrell Capital Management.

Cravath, Swaine & Moore, New York City by Frederick A.O. Schwartz, Jr. and Robert H. Baron, for Defendant Salomon Brothers.

Lowenstein, Sandler, Kohn, Fisher & Boylan, Roseland, NJ by Theodore V. Wells, Jr., for Defendant Michael Steinhardt.

Schulte, Roth & Zabel, New York City by Frederick P. Schaffer, for Defendants Steinhardt Management Co., Inc., and Steinhardt Partners, L.P.

## OPINION AND ORDER

ROBERT P. PATTERSON, Jr., District Judge.

Defendants Salomon Brothers, Caxton Corporation, et. al., move pursuant to Federal Rule of Civil Procedure 56(b) for summary judgment dismissing the claims of Plaintiff Meadowlands, Inc. and for partial summary judgment limiting Three Crown's claims for damages.[1] Defendant Salomon Brothers also moves the court *in limine* to preclude testimony by John J. McConnell, damages expert for Plaintiffs.

### BACKGROUND

The Plaintiffs are Three Crown Limited Partnership ("Three Crown"), which engaged in the business of trading in, among other things, United States Treasury Securi-

---

1. Defendants' motions for partial summary judgment are timely, because fact and expert discovery are closed.

ties and the financial derivatives of such securities; Three Crown Capital Partners ("TCCP"), general partner and commodity pool operator of, and commodity trading advisor to, Meadowlands Funds L.P.; and Meadowlands Fund L.P. ("Meadowlands"), a commodity pool registered with the Commodity Futures Trading Commission, which was in the business of trading, among other things, in Treasury Securities. Plaintiffs allege that Defendants' manipulation of the market for certain United States Treasury Securities injured them and, in the case of Three Crown, destroyed its business. The following facts are deemed to be admitted.[2]

Three Crown was created in New Jersey on July 2, 1990.[3] Its general partner was H. Barndt Hauptfuhrer and its limited partners were Hauptfuhrer Associates, L.P., and Allgrain International, Inc. The business of Three Crown was "to engage in speculative trading in any market, of any product, specifically futures and forward contracts on commodities, financial instruments, currencies and physical commodities." (Wohl Aff.Exh. 3, Notes to Consol.Fin.Stmt., June 30, 1993 at 1).[4] Three Crown is a general partner in TCCP, as was Peter Horowitz, Ltd. (Wohl Aff.Exh. 3, Notes to Consol.Fin.Stmt., June 30, 1993 at 1). The Meadowlands Fund was formed in 1990 by Peter Horowitz and H. Barndt Hauptfuhrer; it is managed by TCCP and trades based upon a computer driven model created by Horowitz. Meadowlands is a separate entity with different ownership from Three Crown and is publicly traded. (Wohl Aff.Exh. 2, Hauptfuhrer Dep. at 19).

Plaintiffs allege collusion by Defendants to manipulate the market for United States Treasury April and May Two Year Notes beginning in April 1991. Plaintiffs contend that defendants Steinhardt and Kovner, managers of Steinhardt Partners' Investment Fund and Caxton Corporation, respectively, believed that the Federal Reserve Bank would cause short term interest rates to be lowered and decided to take an extremely large long position in the April auction of two-year treasury notes ("the April Notes"), both by direct purchases and by repo purchases.[5] This long position would increase in value if short term rates in fact became lower. Plaintiffs contend that the Steinhardt and Caxton Defendants agreed to accumulate large, concentrated long positions in the April Notes and attempted to conceal their accumulation by obtaining their position in the Notes through many different primary dealers. (Wohl Aff.Exh. 1, Hauptfuhrer Rpt. at 4). Subsequently, Plaintiffs allege, the Steinhardt and the Salomon Defendants colluded to accumulate massive long positions in the May Two Year Treasury Notes auctioned in May 1991 ("The May Notes").[6]

During this same period, Three Crown acquired a substantial short position in the April Notes and a smaller short position in the May Notes. Three Crown acquired its short positions in the Notes as part of what Hauptfuhrer states evolved in the latter part of May as a "butterfly trading strategy". The butterfly strategy involved relative value trading pursuant to which Hauptfuhrer took

---

**2.** Pursuant to Rule 3(g) of the Local Civil Rules for the Southern District of New York, both parties to this action have submitted statements of material facts as to which each contends there is no genuine dispute to be tried; this Court takes as true all facts not controverted by opposition papers.

**3.** Three Crown Corporation, its predecessor, was founded prior to 1984.

**4.** Throughout this opinion, citations to the record reference the Exhibit cited as well as the specific source of material referred to and the Second Amended Complaint ("Complaint").

**5.** In a repo transaction a dealer wanting to finance a long position in particular securities

sells those securities to an investor and simultaneously agrees to repurchase from the investor those same securities at a future date at a price equal to the original sale price plus interest accrued at the agreed upon repo (interest) rate. The Repo Market is the largest market in short term funds in the United States. (Compl. ¶ 44). In a reverse repo, a dealer wanting to cover a short position in a particular security purchases those securities and simultaneously agrees to resell them at a price equal to the original price plus interest at a later date. (Compl. ¶ 48).

**6.** The long and short positions of an issue of Treasury Notes are financed by dealers and others and far exceed the total notes issued. *See Three Crown Limited Partnership v. Salomon Brothers,* 1995 WL 422467 (S.D.N.Y.1995).

positions on three different securities—a short position in two year treasury notes, hedged by a long position in treasury securities maturing in 16 to 18 months, and a short position in Three Month ·Treasury Bills ("T–Bill") Futures Contracts. (Wohl Aff.Exh. 2, Hauptfuhrer Dep. at 302–04). According to Hauptfuhrer, Three Crown intended to profit by maintaining its butterfly trading strategy until a perceived discrepancy in pricing in these securities remedied itself. Three Crown contends that it would have maintained the short position it acquired in April by "rolling forward" [7] into the current two year Note every month and rolling forward on a quarterly basis its positions in the treasury securities and Three Month T–Bills Futures Contracts. (Schacter Aff.Exh. 3, McConnell Rpt. at 10–11). Under this strategy, Three Crown would have rolled its position in the April Notes forward into the May Notes at prices prevailing on the auction date for the May Notes—May 22, 1991, the May Notes forward into June Notes, the June Notes forward into July Notes, and so on. (Schacter Aff.Exh. 3, McConnell Rpt. at 10–11). [8]

Plaintiffs contend that Defendants' accumulation of both April and May Notes enabled Defendants to "squeeze" the market by refusing to sell the Notes; this caused the price of the Notes to rise artificially. Defendants thus were able to use their domination of the market for the Notes to obtain lower rates on repo transactions from dealers who needed to conduct reverse repos with Defendants to maintain short positions in the Notes. (Wohl Aff.Exh. 1, Hauptfuhrer Rpt. at 2). Plaintiffs contend that on May 20, 1991, Defendants commenced a campaign of squeezing the financing of entities short on the April Notes. (Schacter Aff.Exh. 3, McConnell Rpt. at 2–3).

Plaintiffs contend that they were injured because Defendants' manipulations adversely affected Three Crown's ability to finance the positions it held as part of the butterfly strategy. As Defendants squeezed the market, the demand for the Notes increased, and Three Crown was forced to pay inflated prices to purchase and inflated rates to borrow the April and May Notes they required to cover their positions. (Compl. ¶ 252–53). Thus, Three Crown's expectations regarding the relationship between the Notes and Treasury Securities having a 16 to 18 month maturity were not fulfilled. Throughout May and June, 1991, the yields of the Notes increased and the losses Three Crown sustained in maintaining its leveraged short position in the Notes grew. At the end of June, 1991, Three Crown's losses had passed their "stop loss" of $1.7 million,[9] and Three Crown closed out its short position in the Notes on June 28, 1991 and abandoned its butterfly strategy. At this time, Hauptfuhrer stopped trading and transferred $1.1 million to the other Three Crown trader, Richard Ruttenberg; shortly thereafter, Three Crown transferred the bulk of its remaining securities purchased for the butterfly strategy to Meadowlands. (Schacter Aff.Exh. 2, Hauptfuhrer Dep. at 15). Subsequently, Meadowlands closed out the positions which had been part of the original butterfly trade at a loss of $601,000. (Horowitz Aff. ¶ 3). Mr. Ruttenberg continued to trade for Three Crown until June, 1992 (Wohl Suppl.Aff.Exh. 3, Horowitz Dep. at 179), and then closed out his positions so that Three Crown could apply the proceeds to its legal fees in this case. (Tr. 49).[10]

The Second Amended Complaint ("Complaint"), filed on April 1, 1993, consists of seventeen claims asserted by Plaintiffs. Counts I–IV of the Complaint allege violations of the Sherman Act, 15 U.S.C. § 1, by

---

7. The term "rolling" is used to refer to the purchase or sale of a security and nearly simultaneous sale or purchase of a security of similar duration but with a later maturity date. (Schacter Aff.Ex. 3, McConnell Rpt. at 10).

8. The Complaint states that Plaintiffs did not roll forward fully its position in the April Notes in view of the high price of the May Notes. (Compl. ¶ 255).

9. According to Hauptfuhrer, when the firm hit the stop loss limit of $1.7 million on their Butterfly Trade in June 1991 the firm as a whole was at "breakeven" for the year. (Schacter Aff.Exh. 2, Hauptfuhrer Dep. at 144).

10. "Tr." denotes citations to the transcript of oral argument on this motion, held on July 19, 1995.

Defendants in connection with an unlawful combination and conspiracy in restraint of trade in the April and May Notes. Counts V–VIII allege violations of Section 10(b) and Rule 10b–5 by various of the Defendants in defrauding participants in the market for April and May Notes. Counts IX–XVI allege violations of the Racketeer Influenced and Corrupt Organizations Act ("RICO") 18 U.S.C. § 1962(b), (c), and (d) by Defendants with respect to their agreement to manipulate the market. Counts XVI–XVII allege commission of common law fraud by Defendants with respect to their manipulation of the market for the April and May Notes.

Plaintiffs seek actual damages totalling over $24 million and treble damages of $73.8 million, as well as punitive damages. The alleged actual damages are divided into three categories: [1] Category A totals $3.59 million in trading losses suffered by Plaintiffs during the period May 20, 1991 to June 28, 1991. $2.99 million of this figure represents losses of Three Crown; the remaining .6 million represents losses suffered by Meadowlands on the remainder of the butterfly; [2] Category B totals $11.02 million and represents what Three Crown asserts it would have earned on the butterfly strategy until February 21, 1992, but for Defendants' manipulation of the Notes; and [3] Category C, which totals $10.14 million, represents Three Crown's estimate of additional profits it would have earned, from February 1992 through December 1994, had it reinvested profits from its butterfly strategy in an unmanipulated market.[11] (Schacter Aff.Exh. 3, McConnell Rpt. 12–17). Defendants' motion is addressed [12] primarily to eliminating Category B and C damages and all damages sought by Plaintiff Meadowlands.

11. McConnell arrived at this figure by making an estimate of what Three Crown's return on capital would have been for the remainder of 1991 by averaging its historic returns from 1985 to 1993, an annual estimated annual rate of return of 36%, and applying it to the period June 1991 to December 1994.

12. In their brief, the Salomon Defendants raise questions regarding Plaintiffs' calculation of Category A damages. These questions, however,

## Discussion

Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). Summary judgment cannot issue if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986). The initial burden rests on the moving party to demonstrate that there exists no genuine issue of material fact and that it is entitled to judgment as a matter of law. *See Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157, 90 S.Ct. 1598, 1608, 26 L.Ed.2d 142 (1970). The moving party may satisfy its burden by showing the absence of evidence which would support the claims made by the non-moving party. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 325, 106 S.Ct. 2548, 2553–54, 91 L.Ed.2d 265 (1986). The Court must view the facts in the light most favorable to the non-moving party. *See United States v. Diebold, Inc.*, 369 U.S. 654, 655, 82 S.Ct. 993, 994, 8 L.Ed.2d 176 (1962). If, however, the evidence presented by the nonmoving party "is merely colorable, or is not significantly probative, summary judgment may be granted." *Anderson v. Liberty Lobby*, 477 U.S. at 249–250, 106 S.Ct. at 2511 (internal citations omitted); *See also Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986) ("Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no 'genuine issue for trial.' ... It follows from these settled principles that if the factual context renders respondents' claim implausible ... respondents must come forward

raise genuine issues of material fact which will have to be resolved at trial. The Salomon Defendants' arguments concern the sort of uncertainty in the calculation of damages towards which the language of *Bigelow v. RKO Radio Pictures*, 327 U.S. 251, 265, 66 S.Ct. 574, 580, 90 L.Ed. 652 (1946); *Story Parchment Co. v. Paterson Parchment Paper Co.*, 282 U.S. 555, 51 S.Ct. 248, 75 L.Ed. 544 (1931); and *United States Football League v. National Football League*, 842 F.2d 1335, 1379 (2d Cir.1988) was directed.

with more persuasive evidence to support their claim than would otherwise be necessary." *Id.* at 587, 106 S.Ct. at 1356. (internal citations omitted)).

I. *Three Crown's Claims for Category B Damages (lost profits) and Category C Damages (lost future profits)*

Defendants contend that they are entitled to summary judgment on Three Crown's Category B and Category C claims for lost profits and lost future profits because, given Three Crown's failure to pursue its butterfly trading strategy after June 28, 1991, the figures lack the requisite causational proof and are purely speculative. Three Crown counters that Defendants' arguments raise questions regarding the scope of recovery which should be left to the jury.

Three Crown's Category B and C damages both are grounded upon Hauptfuhrer's testimony that he would have continued the butterfly strategy until the target Federal Funds rate exceeded the Three Month T–Bill rate and upon Category B calculations by Three Crown's expert, Professor John J. McConnell, as to the profitability of the butterfly strategy but for Defendants' manipulative actions.[13] McConnell's Category C calculations include estimates of what Three Crown's returns on investment would have been based in part on profits it would have made if the butterfly strategy continued.

The accuracy of McConnell's calculations cannot be determined without considering the underlying assumptions McConnell made about market conditions in U.S. Treasury Securities and about the sort of trades Three Crown would have made in that market over the course of seven months for Category B and in other trading activity during a period of almost three years from February, 1992, for Category C. (Schacter Aff.Exh. 3, McConnell Rpt. at 7, 11–12). To generate his lost profits (Category B) figure, McConnell made the assumptions that a trading strategy existed (Wohl Suppl.Aff.Exh. 5, McConnell Dep. at 79), the starting and ending dates of that strategy,[14] what the prices of the April and May Notes would have been absent the alleged manipulation,[15] what financing rates Three Crown would have received and paid in maintaining its leveraged positions during its execution of the strategy, and what investments and other trading activity would have ensued if Three Crown had maintained its positions. (Schacter Aff.Exh. 3, McConnell Rpt. at 7).[16] McConnell further assumed that Defendants' actions caused Three Crown to deviate from its butterfly strategy, but did not attempt to control for other possible reasons—such as more profitable opportunities—for deviating from that strategy subsequent to June 28, 1991. (Wohl Suppl.Aff.Exh. 5, McConnell Dep. at 80).

**13.** Plaintiffs address their claims for Category B and Category C damages separately, arguing that Defendants destroyed Three Crown's business, which entitles them to lost future profits (Category C damages) based on profits they would have made on the butterfly trading strategy (Category B damages). Deficiencies in Plaintiffs' proof with respect to how Defendants' actions caused the destruction of Three Crown's business, however, would affect both Category B and Category C damages.

**14.** With respect to Category B, the report sets those dates at May 20, 1991 and February 21, 1992. McConnell explains that the ending date was chosen by comparing a target Federal Funds rate, the three month T–Bill rate and the three month T–Bill futures contract rate. (Schacter Aff.Exh. 3, McConnell Rpt. at 8). According to the report, Three Crown's strategy would have been profitable until either: [1] the target Federal Funds Rate exceeded the three month T–Bill rate or [2] the three month T–Bill rate exceeded

the three month futures contract rate. *Id.* In addition to the two conditions McConnell relied upon, Hauptfuhrer testified that the strategy would no longer be attractive to Three Crown when the 16 to 18 month security became fairly priced in relation to the current two year note. (Wohl Aff.Exh. 2, Hauptfuhrer Dep. at 302–03). McConnell testified that he did not rely upon Hauptfuhrer's additional condition in making his analysis because he could not "affix quantifiable or quantitative or numerical characteristics" to the description made by Hauptfuhrer. (Wohl Aff.Exh. 8, McConnell Dep. at 107).

**15.** These figures were based upon those provided by Bradford Jordan, an expert for Plaintiffs, who used the price of similar securities to estimate the unmanipulated price of the Notes.

**16.** Three Crown, which had capital in 1991 of approximately $7 million, would take leveraged trading positions as high as $1 or $1.5 billion. (Wohl Aff.Exh. 2, Hauptfuhrer Dep. at 236–238).

With respect to Category C damages, Professor McConnell calculated the amount Three Crown would have earned through reinvestment of its capital from February 21, 1992 (the close of the Category B damage period) through the end of 1994. This calculation assumed that Three Crown's capital available for reinvestment would have included the profits set forth in McConnell's Category B calculations. (Schacter Aff.Exh. 3, McConnell Rpt. at 12–13). Then, based on a review of Three Crown's past performance over the years 1985–1993, McConnell arrived at a 36% annual rate of return to apply to Three Crown's "capital," he arrived at a lost profits figure of $10.14 million. (Schacter Aff.Exh. 3, McConnell Rpt. at 19–20).

Because Three Crown claims that it is entitled to relief based upon violations of several statutes and commission of common law fraud, the availability of damages of the type sought by Three Crown is examined under each theory of liability.

### 1. *Antitrust Claims*

■ Three Crown contends that summary judgment is inappropriate on its claims for Category B and C damages under the antitrust laws because it bears only a modest burden with respect to proof of damages and therefore the claims raise triable issues of fact. Three Crown contends that *Bigelow v. RKO Radio Pictures Inc.*, 327 U.S. 251, 66 S.Ct. 574, 90 L.Ed. 652 (1946) and *Story Parchment Co. v. Paterson Parchment Paper Co.*, 282 U.S. 555, 51 S.Ct. 248, 75 L.Ed. 544 (1931) support its claims for lost profits and lost future profits. With respect to violations of antitrust laws, the *Bigelow* Court, following the rule enunciated in *Story Parchment*, acknowledged that "[t]he most elementary conceptions of justice and public policy require that the wrongdoer shall bear the risk of the uncertainty which his own wrongdoing has created." *Id.* 327 U.S. at 265, 66

S.Ct. at 580; *See also United States Football League v. National Football League*, 842 F.2d 1335 (2d Cir.1988) ("where damages have been shown to be attributable to the defendant's wrongful conduct, but are uncertain in amount, the defendant bears the risk of those uncertainties." *Id.* at 1379). Despite such warnings to defendants in antitrust litigation, courts have made it clear that proof of causation is required to recover damages for violations of the antitrust laws. In *Story Parchment*, the Court described the contours of the causation requirement by quoting an earlier New York case. "The general rule is, that all damages resulting necessarily and immediately and directly from the breach are recoverable, and not those that are contingent and uncertain." *Story Parchment*, 282 U.S. at 563, 51 S.Ct. at 250 (quoting *Taylor v. Bradley*, 4 Abb.Ct. App. at 363 (N.Y.)). *See also United States Football League*, 842 F.2d 1335 ("Whatever latitude is afforded antitrust plaintiffs as to proof of damages, however, is limited by the requirement that the damages awarded must be traced to some degree to unlawful acts ... That latitude is thus circumscribed by the need for proof of causation." *Id.* at 1378 (internal citations omitted)).[17]

■ With respect to Category B and C damages, Three Crown seeks to recover profits from investments it never made on securities it never purchased or sold, based on the theory that as a consequence of Defendants' manipulation of the market, Three Crown was not able to engage in those unnegotiated and unconsummated trades. Three Crown's theory of causation is based on Hauptfuhrer's assertions that he would have continued the butterfly strategy but for Defendants' alleged manipulation. Accordingly, whether the damages Three Crown seeks flow directly from Defendants' conduct must be scrutinized carefully. *See Associated General Contractors of California v. Califor-*

---

17. Judge Friendly in *Zeller v. Bogue Elec. Mfg. Corp.*, 476 F.2d 795 (2d Cir.1973), *cert. denied* 414 U.S. 908, 94 S.Ct. 217, 38 L.Ed.2d 146 (1973) stated: "[s]ince consequential damages are an addition to or in lieu of what would ordinarily constitute a fair recovery, there is no room here for applying the liberal principles of *Eastman Kodak Co. v. Southern Photo Materials*

Co., 273 U.S. 359, 379, 47 S.Ct. 400, 405, 71 L.Ed. 684 (1927); *Story Parchment Co. v. Paterson Parchment Paper Co.*, 282 U.S. 555, 563, 51 S.Ct. 248, 250–51, 75 L.Ed. 544 (1931); and *Bigelow v. RKO Radio Pictures, Inc.*, 327 U.S. 251, 264, 66 S.Ct. 574, 579, 90 L.Ed. 652 (1946), where some liberality is required to enable an injured plaintiff to recover anything." *Id.* at 803.

*nia State Council of Carpenters*, 459 U.S. 519, 103 S.Ct. 897, 74 L.Ed.2d 723 (1983). ("The indirectness of the alleged injury also implicates the strong interest, identified in our prior cases, in keeping the scope of complex antitrust trials within judicially manageable limits." *Id.* at 543, 103 S.Ct. at 911); *Reading Indus. v. Kennecott Copper Corp.*, 631 F.2d 10 (2d Cir.1980) *cert. denied* 452 U.S. 916, 101 S.Ct. 3051, 69 L.Ed.2d 420 (1981) (antitrust laws preclude conjectural theories of injury and attenuated arguments as to causation of economic harm).[18]

■ Three Crown's claim for damages under the antitrust laws relies upon the following propositions: Three Crown modified its relative value trading strategy in April and May, 1991 based on its perceptions of the discrepancies in market prices of each of the composite securities (Pl.Mem. 18, 22, 73); Three Crown failed to make additional trades that it believes it would have made but for Defendants' squeeze (Pl.Mem. 23–25, 42, 44, 63); Three Crown is entitled to direct damages calculated in Category A for unprofitable trades which it did enter (Pl.Mem. 61–62); Three Crown is entitled to Category B and C damages because Defendants' conduct caused it to go out of business.

This last premise of damages is based not upon proof that Defendants intended to cause Three Crown to go out of business, but upon proof that Defendants intended to make money at the expense of those in the short position.[19] Counsel have not cited and this Court has been unable to find a single case involving improper conduct in a horizontal market where, absent a specific intent to injure the plaintiff, a court has allowed recovery of damages for the type of future profits

Three Crown seeks. Even where a cartel, monopolist, or price fixing conspiracy inflates the price of a product to the injury of its customers, damages are measured by the difference between the price paid and the uninflated price, with the result trebled pursuant to 15 U.S.C. § 15(a). *Berkey Photo v. Eastman Kodak Co.*, 603 F.2d 263, 296–297 (2d Cir.1979) *cert. denied* 444 U.S. 1093, 100 S.Ct. 1061, 62 L.Ed.2d 783 (1980); *Hawaii v. Standard Oil Co. of California*, 405 U.S. 251, 262 n. 14, 92 S.Ct. 885, 891 n. 14, 31 L.Ed.2d 184 (1972); *New York v. Hendrickson Bros. Inc.*, 840 F.2d 1065, 1077 (2d Cir.1988), *cert. denied*, 488 U.S. 848, 109 S.Ct. 128, 102 L.Ed.2d 101 (1988); *Strobl v. New York Mercantile Exchange*, 582 F.Supp. 770, 779 (S.D.N.Y.1984).

As support for the availability of Category B and C damages, Three Crown relies upon decisions in cases where mechanisms were used with an intent to harm specific parties, namely: boycotts, refusals to deal, terminations, and exclusions. *Bigelow* and *Story Parchment Co.*, two of the primary Supreme Court decisions upon which Three Crown relies, both involved defendants that intended to exclude the plaintiffs from dealing in a particular market. *See Bigelow*, 327 U.S. 251, 66 S.Ct. 574, 90 L.Ed. 652 (1946); *Story Parchment*, 282 U.S. 555, 51 S.Ct. 248, 75 L.Ed. 544 (1931); *See also Fishman v. Estate of Wirtz*, 807 F.2d 520 (7th Cir.1986) (affirming lost financial gain as appropriate measure of damages, where trial court found that defendants intentionally destroyed plaintiff's business opportunity by concerted efforts to exclude him from ownership of professional basketball team); *Pierce v. Ramsey Winch Co.*, 753 F.2d 416, 429 n. 15 (5th

18. As found in this Court's opinion of July 14, 1995, Plaintiff's antitrust claims are not foreclosed merely because of the indirectness of the injury because this is a horizontal market manipulation case. *Three Crown Limited Partnership v. Salomon Brothers*, 1995 WL 422467 (S.D.N.Y. 1995). Assuming injury and causation, the extent of damages to be allowed for that injury is what Defendants have addressed by their motions addressed to Category B and C damages.

19. As stated in this Court's prior opinion, *Three Crown Limited Partnership v. Salomon Brothers*, 1995 WL 422467 (S.D.N.Y.1995), Three Crown did not purchase or finance its positions in the two year Notes directly from Defendants, and thus Three Crown was not the direct object of Defendants' alleged manipulation of the price of the Notes or of the repo rates for financing the notes. Defendants made April and May Note trades or repo transactions with counterparties and those counterparties in turn entered into deals with other counterparties; at some point, some counterparty dealt with Three Crown while it was establishing and maintaining its short position in the Two Year Notes. There is no evidence that Defendants were aware of Three Crown's short positions in the Notes.

Cir.1985) (endorsing lost profits as a measure of damages in distributor termination cases); *Construction Aggregate Trans. v. Florida Rock Indus., Inc.,* 710 F.2d 752 (11th Cir. 1983) (explaining, with respect to damages in a case involving refusal to deal, that "[l]oss of future profits is a well-established basis for determining the measure of economic injury resulting from an anticompetitive act which forces the victim out of business." *Id.* at 786). Here, in contrast, Three Crown has presented no evidence to indicate that Defendants intended to injure it or run it out of business, or even that Defendants' knew of Three Crown's investments in the short positions in the Notes.

Three Crown's reliance on *Atlantic City Electric Co. v. General Electric,* 226 F.Supp. 59 (S.D.N.Y.1964) as support for the availability of lost profits is misplaced. In *Atlantic City Electric,* the court used the term "lost profits" to refer to a reduction of the full damages for overcharges sought by the plaintiffs, because the plaintiffs had partially passed on its inflated cost to its customers. The court awarded the amount of the overcharge.

■ Also with respect to lost profits, Three Crown seeks to rest its claims for Category B and C damages upon *Minpeco S.A. v. Conticommodity Services Inc.,* 676 F.Supp. 486 (S.D.N.Y.1987) and 718 F.Supp. 168 (S.D.N.Y.1989), where the plaintiff was allowed to recover for its losses in closing out its short position in silver futures and for the profits it would have made on those transactions in an unmanipulated market. All of the damages allowed in *Minpeco* were caused by the defendants' manipulation of the market and related to the plaintiff's loss of the benefit of its bargain on positions it held within the market. Three Crown, in contrast, seeks to recover damages in Categories B and C for trades it never made on securities which concededly were not affected by Defendants' alleged manipulation. *Minpeco* is not support for the Category B and C damages Three Crown seeks on trades never negotiated or positions never held. Under *Minpeco,* Three Crown may, as an aspect of its claims for Category A damages, introduce evidence at trial of profits it would have reaped, absent Defendants' manipulation of the market, from positions it *actually took* in the April and May Notes. *See Minpeco,* 676 F.Supp. at 492–495; *See also Strobl v. New York Mercantile Exchange,* 582 F.Supp. 770, 779 (S.D.N.Y.1984) *aff'd,* 768 F.2d 22 (2d Cir. 1985) *cert. denied* 474 U.S. 1006, 106 S.Ct. 527, 88 L.Ed.2d 459 (1985).[20]

■ Three Crown also places some weight on the statement by the court in *Transnor (Bermuda) Ltd. v. BP North Amer. Petro.,* 736 F.Supp. 511 (S.D.N.Y.1990): "[o]nce the fact of damages, i.e. injury and causation, is established, plaintiff has a lessened burden of proof in showing the amount of its damages." *Id.* at 514. Accordingly, the *Transnor* court refused to grant summary judgment to the defendants on the plaintiffs' claims for lost profits with respect to the Brent Oil market, in which they had made substantial investments which were rendered unprofitable by the defendants' manipulations of the market.[21] The *Transnor* plaintiffs' Brent Market claims parallel Three Crown's Category A damages, which should encompass all losses, including lost profits, sustained as a result of investments Three Crown in fact made or sold due to Defendants' alleged manipulation. In addition, however, the *Transnor* court recognized that "damages may not be determined based on speculation or guesswork." *Transnor,* 736 F.Supp. at 515. The *Transnor* court distinguished and granted partial summary judgment to defendants on elements of the plaintiffs' claims which were not supported by adequate evidence of damages stemming from an injury to the business or property of the plaintiff. *See Transnor,* 736 F.Supp. at 517. The court excluded claims for damages for lost profits on oil deals in

---

**20.** The profits Three Crown would have made on April and May Note positions it in fact held, in that it cannot be said with certainty what would have been the price for those Notes absent Defendants' alleged manipulations, is the type of uncertainty of damage contemplated in *Bigelow,* 327 U.S. at 265, 66 S.Ct. at 580.

**21.** In *Transnor,* the plaintiffs' claims for damages sustained by their defaults on contracts to purchase Brent Oil, caused by defendants' price manipulation, were also allowed to proceed to trial.

other markets which plaintiff did not consummate or for profits based upon the assertion that the defendant's acts had precluded the plaintiffs from engaging in a line of business which otherwise would have been profitable. The court concluded that Transnor could " 'not recover lost profits by projecting a course of business [it] deliberately didn't pursue.' " *Id.* at 518 (quoting *Grip–Pak v. Illinois Tool Works, Inc.,* 651 F.Supp. 1482, 1504 (N.D.Ill.1986)). Three Crown seeks to distinguish its position from that of the *Transnor* plaintiffs by stating that it did pursue the line of business, until the moment at which Defendants' misconduct rendered it impossible to do so. This argument, however, is unavailing. At the end of June, 1991, Three Crown concededly was left with $3.8 million in capital. (Wohl Aff.Exh. 2, Hauptfuhrer Dep. at 39). The firm made the choice to commit part of its remaining capital to Meadowlands and the remaining sum to another employee trader, Richard Ruttenberg. (Schacter Aff.Exh. 1, Horowitz Dep. 179, 808). Hauptfuhrer made no further attempt to leverage or to finance Three Crown's relative value trading or to raise funds to support that trading; instead, he switched his relative value trading to Meadowlands. (Wohl Aff.Exh. 2, Hauptfuhrer Dep. at 49) and once there, there is no evidence that he pursued his butterfly trading strategy. Three Crown could have replaced its lost capital from existing or new sources if potentially profitable trades were to be made, but it made no effort to obtain such funds. Despite its claim of inability to continue business, Three Crown did not enter bankruptcy or liquidation proceedings (Tr. 41–42). The only reasonable conclusion is that Three Crown deliberately chose not to pursue further trading on its butterfly strategy. Like the plaintiffs in *Transnor,* under such circumstances, Three Crown is responsible for its lost profits and cannot under the antitrust laws seek damages for business opportunities it failed to pursue.[22]

▪ Three Crown's assertions that it was unable to continue the butterfly strategy with the capital it possessed after selling the short positions in the April and May Notes and that it could not raise additional capital for such purposes are based wholly on conclusory and self-serving statements of its principals without supporting documentation. Assertions of this nature are insufficient evidence of causation to withstand a summary judgment motion. *See Argus, Inc. v. Eastman Kodak Co.,* 801 F.2d 38 (2d Cir.1986) (affirming summary judgment for defendant in antitrust suit based upon plaintiff's failure to demonstrate adequate causal relationship between all injuries for which it sought recovery and the defendants' alleged noncompetitive conduct). To survive summary judgment, the plaintiffs were obligated to provide more than "the 'isolated self-serving statements' of a plaintiff's corporate officers." *Id.* at 42 (quoting *H & B Equipment Co. v. International Harvester Co.,* 577 F.2d 239, 247 (5th Cir.1978)) (quoting *Yoder Bros., Inc. v. California–Florida Plant Corp.,* 537 F.2d 1347, 1371 & n. 25 (5th Cir.1976)). Likewise here, Three Crown's claims for lost profits and lost future profits under the Section 4 of the Clayton Act, 15 U.S.C. § 15, for violations of Section 1 of the Sherman Act, 15 U.S.C. § 1, are based upon conclusory statements of Plaintiffs' officers that Three Crown was driven out of business, whereas the undisputed evidence shows that after cutting its losses, Three Crown still possessed assets with which it could have continued to utilize the butterfly strategy, albeit by taking smaller positions on a leveraged basis.

Secondly, based on the McConnell report Three Crown's calculation of damages assumes that in an unmanipulated market,

22. Defendants have cited a recent decision of the Seventh Circuit, *Sanner v. City of Chicago Board of Trade,* 62 F.3d 918 (7th Cir.1995), as support for the proposition that Plaintiffs lack standing to pursue their speculative damages claims under the antitrust laws. In *Sanner,* the court found that farmers who alleged that the results of market manipulation by the defendants caused them to refrain from selling their crops lacked standing to sue for damages under the antitrust laws.

Defendants contend that *Sanner* extends the Supreme Court's holding in *Blue Chip Stamps v. Manor Drug Stores,* 421 U.S. 723, 95 S.Ct. 1917, 44 L.Ed.2d 539 (1975), to the antitrust context. Because Plaintiffs are precluded, pursuant to this Opinion, from seeking damages for lost profits and lost future profits under the Sherman and Clayton Antitrust Acts, this Court will not resolve the constitutional issue of whether Plaintiffs have standing to sue under Article III.

Three Crown would have continued to roll forward its positions on the Two Year Notes each month until February 21, 1992. (Schacter Aff.Exh. 3, McConnell Rpt. at 8). Thus, after June or July 1991, the butterfly strategy would have had no positions in the securities that Defendants are alleged to have manipulated. The evidence is not sufficiently strong to support McConnell's assumption that Three Crown would have maintained a steady position in the butterfly strategy or that it in fact would have rolled forward its entire position in each month's issue throughout the remainder of 1991. (Hausman Aff. Exh. A). Under Hauptfuhrer's leadership, the company's trading strategy was admittedly discretionary, relative value trading. (Wohl Aff.Exh. 2, Hauptfuhrer Dep. at 17–19; 48). His strategy evolved to respond to and to reflect frequent changes in the market and other economic news. (Wohl Suppl. Aff.Exh. 2, Hauptfuhrer Dep. at 49–56). In this regard, Hauptfuhrer testified that "it was not at all unusual for me to adjust, modify a trade as it went forward." (Wohl Aff.Exh. 2, Hauptfuhrer Dep. at 1108). Indeed, Hauptfuhrer testified to the fact that the butterfly strategy which is the basis for Three Crown's claims did not take its "final form"—the form upon which Three Crown's claims rely, until the latter part of May, 1991, over a month after Three Crown first acquired its positions in the April Notes. (Wohl Aff.Exh. 2, Hauptfuhrer Dep. at 296–298). Hauptfuhrer's willingness to take highly leveraged positions,[23] his testimony that his discretionary trading strategy led him to modify his trades frequently in order to keep pace with current events in the marketplace, and the natural volatility of the market in U.S. Treasury Securities weigh heavily against McConnell's assertions that he could predict with the requisite degree of certainty the final form Three Crown's trading would have taken or the ultimate financial outcome of the "strategy" implemented in April, 1991.[24]

Thus, Three Crown's claims in antitrust for Category B and C damages cannot be recovered: [1] since there is no evidence that Defendants intended to run Three Crown out of business and [2] because those damages are not based upon adequate proof that Defendants' alleged manipulation caused Three Crown to be unable to continue trading the unmanipulated securities for which it seeks damages or that Three Crown would have carried on the butterfly strategy for any particular period of time. Since Category C damages are based on assumed profits to be made in Category B, and the evidence does not support its claim of being run out of business, Category C damages likewise are

**23.** Hauptfuhrer testified to the leveraging of the positions which comprised the butterfly strategy.

"Q. Do you also understand the term "leveraged" to be used to describe a relationship between the amount of capital that you have and the amount of security that you can invest? A. I think that's what I just described. I mean anyone who tells me that someone with a $200 million outright long bond position is left less bonds than somebody who is short 500 million old two's has no concept of what our business is all about.
Q. So the risk of one is offset by the other?
A. The largest risk is you have to raise more money to finance the positions, but in terms of the opportunity to lose capital it's not even close in a nonmanipulated market ...
Q. Do you recall the size of the largest position that you held in 1991?
Mr. Schacter: Objection. Are you talking about any piece of an arbitrage position?
Mr. Murray: Yes.
Mr. Schacter: Are you defining largest in terms of principal amount, dollar value, an overrun or something else?

Mr. Murray: Principal amount.
A. I think we had a billion dollar position in the Eurodollar market some point during that year ...
A. I think it was part of a TED spread where we were long or short a billion on the other side or a billion and a half, whatever it was. I don't recall specifically.
Q. You had approximately $7 million in capital in 1991?
A. Approximately at that time.
Wohl Aff.Exh. 2, Hauptfuhrer Dep. at 236–238.

**24.** McConnell's analysis that Hauptfuhrer would have continued the butterfly strategy until February, 1992, because until then the federal funds rate did not exceed the three month T–Bill rate is somewhat flawed in that the federal funds rate did exceed the Three Month T–Bill rate three days in June, 1991 and Hauptfuhrer did not discontinue his positions when that occurred. The discrepancy between the yield of securities of 16 to 18 months maturity and the May Two Year Notes on which Hauptfuhrer did state he relied, still existed on those dates, however.

not recoverable in antitrust by Three Crown on its claims against Defendants.

### 2. *Securities Fraud Claims*

Three Crown argues that the Securities Exchange Act of 1934, § 10(b), 15 U.S.C. § 78j(b), and Rule 10b–5, 17 C.F.R. § 240.10b–5, support its claims for Category B and C damages because claims for lost profits are allowed in securities fraud cases. Section 28(a) of the Securities Exchange Act of 1934, 15 U.S.C. § 78bb(a) defines the damages to which a "party aggrieved" is entitled as "actual damages." [25] Three Crown suggests that the "actual damages" language is sufficiently broad to encompass its claims for Category B and Category C damages, given the Supreme Court's consideration of the meaning of § 28(a) with respect to another provision of the 1934 Act in *Randall v. Loftsgaarden,* 478 U.S. 647, 106 S.Ct. 3143, 92 L.Ed.2d 525 (1986). In *Randall,* the Court stated that it "has never interpreted § 28(a) as imposing a rigid requirement that every recovery on claims under the 1934 Act must be limited to the plaintiff's net economic harm." *Id.* at 648, 106 S.Ct. at 3145.

The decision in *Randall v. Loftsgaarden,* however, did not disturb prior rulings by which the Supreme Court had defined and limited the scope of damages available in 10b–5 actions. Under Section 10(b) of the Securities and Exchange Act of 1934, 15 U.S.C. § 78j(b) and relevant case law, an entity is only entitled to sue for damages if it is a "purchaser or seller" of the allegedly manipulated securities. In *Blue Chip Stamps v. Manor Drug Stores,* 421 U.S. 723, 95 S.Ct. 1917, 44 L.Ed.2d 539 (1975), the Court held that § 10(b) and Rule 10b–5 limit collection of damages to plaintiffs who are in fact purchasers or sellers in the securities alleged to have been manipulated. The Court explained that:

[w]hile the damages suffered by purchasers and sellers pursuing a § 10(b) cause of action may on occasion be difficult to ascertain ... in the main such purchasers and sellers at least seek to base recovery on a demonstrable number of shares traded. In contrast, a putative plaintiff, who neither purchases nor sells securities but sues instead for intangible economic injury such as loss of a noncontractual opportunity to buy or sell, is more likely to be seeking a largely conjectural and speculative recovery in which the number of shares involved will depend on the plaintiff's subjective hypothesis.

*Id.* at 734–35, 95 S.Ct. at 1925. As previously explained, in its Category B and C damages, Three Crown seeks, in addition to trades it did make, recovery for trades it never made or negotiated. The rationale of *Blue Chip Stamps* precludes such recovery in Rule 10b–5 suits. *See also First Equity Corp. of Florida v. Standard & Poor's Corp.,* 869 F.2d 175 (2d Cir.1989) ("Under *Blue Chip,* plaintiffs suing under section 10(b) of the Securities Exchange Act of 1934 may recover only for losses that result from decisions to buy or sell, not from decisions to hold or refrain from trading." *Id.* at 180 n. 2); *Deutschman v. Beneficial Corp.,* 841 F.2d 502 (3d Cir.1988) ("The only standing limitation recognized by the Supreme Court with respect to Section 10(b) damages actions is the requirement that the plaintiff be a purchaser or seller of a security." *Id.* at 506).

The Second Circuit's decision in *Zeller v. Bogue Elec. Mfg Corp.,* 476 F.2d 795 (2d Cir.1973), cited by Three Crown in support of its argument that its Category B and C damages should be available as consequential damages, does not support Three Crown's Category B and C damages because the *Zeller* court was faced with a different set of circumstances.[26] In *Zeller,* the plain-

25. In relevant part, the provision reads:

... The rights and remedies provided by this chapter shall be in addition to any and all other rights and remedies that may exist at law or in equity; but no person permitted to maintain a suit for damages under the provisions of this chapter shall recover, through satisfaction of judgment in one or more actions, a total amount in excess of his actual damages on account of the act complained of ...
15 U.S.C.A. § 78bb(a).

26. The *Zeller* court, moreover, considered the merits of the defendants' summary judgment motion based upon the more stringent standards for granting summary judgment which predated the Supreme Court's decisions in *Celotex Corp. v.*

tiff met Rule 10b–5's purchaser or seller requirement and the court specifically cautioned that consequential damages would be limited to profits which would have been earned but for the defendants' fraudulent conduct which formed the basis for the 10b–5 claim. *See id.* at 803. Unlike *Zeller*, where the plaintiff's claims for consequential damages were supported by documentation that the corporation had planned the stock offering, Three Crown's category B and C claims are based upon Hauptfuhrer's and McConnell's assumptions about a myriad of trades Three Crown would have engaged in, but for Defendants' manipulation. Three Crown cannot seek consequential damages based on these speculative claims.[27]

The Second Circuit's discussion of the meaning of *Zeller* in a subsequent decision provides further insight into limitations placed upon plaintiffs seeking damages in excess of their out-of-pocket losses on claims under Rule 10b–5. In *Osofsky v. Zipf*, 645 F.2d 107 (2d Cir.1981), the court allowed a plaintiff in securities litigation to proceed on claims for benefit-of-the-bargain damages where it had put forth nonspeculative evidence of the extent of damage it suffered as a result of the defendants' fraudulent acts. The *Osofsky* court explained:

> We believe that the benefit-of-the-bargain rule should be applied under the 1934 Act to the limited situation involved in this case, where misrepresentation is made in the tender offer and proxy solicitation materials as to the consideration to be forthcoming upon an intended merger. But, of course, giving the plaintiff benefit-of-the-bargain damages is appropriate only when they can be established with reasonable certainty ... In the case at bar ... the amount of such damages—the difference between what was represented as coming to the B & W shareholders and what they actually received—can be determined with certainty.

*Id.* at 114. In contrast to the claims in *Osofsky*, Three Crown's claims for Category B and C damages cannot be determined with reasonable certainty.

■ Furthermore, a plaintiff's lost future profits are not recoverable in Rule 10b–5 actions. The Second Circuit's recent rejection of investors' claims for lost returns on investment capital in a Rule 10b–5 action, where the investors had been fully reimbursed for their losses, provides insight into the limits on such damage claims. *Commercial Union Assur. Co., plc v. Milken*, 17 F.3d 608 (2d Cir.1994) affirmed summary judgment for the defendants. The court explained the connection between the lost future profits damages sought by the plaintiffs and prejudgment interest claims:

> Appellants aver the lack of return on their capital investment *is the damage* they have incurred. Because lack of return is the kind of rationale usually relied on for awarding prejudgment interest, we must analyze the district court's disposition using the guides for determining whether or not to make an award of prejudgment interest.

*Id.* at 613. The court cautioned that "[i]n deciding whether an award of prejudgment interest is warranted, it must be remembered that this is an equitable remedy and courts must be careful that an award does not overcompensate a plaintiff." *Id.* at 614. Three Crown protests that its Category C claims are *not* prejudgment interest claims. The Category C claims, which support a plea for "future profits" amounting to a 36% annual return on investments based on an averaging of historical rates of return of Three Crown and its predecessor corporation are, however, essentially the same as the damages sought by the plaintiffs in *Commercial Union*, which were rejected by the court.

In sum, Three Crown cannot maintain its claims for Category B and C damages under § 10(b) of the Securities Exchange Act of

---

*Catrett*, 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); *Anderson v. Liberty Lobby*, 477 U.S. 242, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); and *Matsushita Elec. Indus. Co. v. Zenith Radio*, 475 U.S. 574, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986).

**27.** To the extent Three Crown's Category A damages are based on its losses on covering its short position in the market, it may also attempt to show that in a market adjusted for Defendant's manipulation, it was consequentially damaged because it would have made a profit on the positions it took. *Cf. Minpeco*, 676 F.Supp. 486.

1934 and Rule 10b–5 because it neither purchased nor sold securities which allegedly were manipulated by Defendants after it relinquished its positions in the April and May Notes in June, 1991; and it neither purchased nor sold the securities on which it bases its damage claims in Categories B and C; and its Category B and C claims do not establish the damages with reasonable certainty.

### 3. *Common Law Fraud Claims*

 Three Crown also argues that Defendants' commission of common law fraud provides a basis for awarding it damages including lost profits and lost future profits. The cases cited by Three Crown in support of its position with respect to damages in common law fraud actions establish that consequential damages may be available, when, as in securities cases, the plaintiff can prove the causal nexus between the fraudulent conduct or misrepresentation and its injury with sufficient certainty. *See Ostano Commerzanstalt v. Telewide Sys. Inc.*, 880 F.2d 642 (2d Cir.1989); *Academic Indus., Inc. v. Untermeyer Mace Partners, Ltd.*, 1992 WL 73473 (S.D.N.Y.1992); *The Limited, Inc. v. McCrory Corp.*, 683 F.Supp. 387 (S.D.N.Y. 1988). New York law, however, allows plaintiffs in common law fraud actions to recover only for actual pecuniary losses (out-of-pocket losses and consequential damages) and not for future profits. *See AFA Protective Systems v. American Tel. & Tel.*, 57 N.Y.2d 912, 456 N.Y.S.2d 757, 442 N.E.2d 1268 (1982); *Delcor Laboratories, Inc. v. Cosmair, Inc.*, 169 A.D.2d 639, 564 N.Y.S.2d 771 (1st Dept. 1991); *Orbit Holding Co. v. Anthony Hotel Corp.*, 121 A.D.2d 311, 503 N.Y.S.2d 780 (1st Dept.1986).

 As explained *supra*, under New York common law as in its federal antitrust and securities claims, Three Crown's evidence fails to establish with sufficient certainty a causal nexus between Defendants' fraudulent acts and the type of injury which Category B and Category C damages aim to redress to survive Defendants' motion for summary judgment.

### 4. *RICO Claims*

Three Crown also contends that it is entitled to Category B and C damages based upon the existence of a criminal enterprise in violation of RICO. The Second Circuit has expressed the view that, in general, basic damages in RICO suits should be compensatory:

> [C]ongress intended the basic award under civil RICO to compensate the plaintiff for injury to "his property or business." 18 U.S.C. § 1964(c) (1984). As in other areas of the law, this compensation takes the form of awarding damages sufficient to place the plaintiff in the same financial position he would have occupied absent the illegal conduct.

*Bankers Trust Co. v. Rhoades*, 859 F.2d 1096, 1106 (2d Cir.1988). Three Crown maintains that the damages it alleges in its Category B and C claims constitute compensation under RICO. In support of its argument, Three Crown cites *Sound Video Unlimited, Inc. v. Video Shack Inc.*, 700 F.Supp. 127 (S.D.N.Y.1988), in which the court found that a RICO plaintiff may recover lost profits.

 The court in *Sound Video Unlimited*, drawing upon a prior district court holding, made only the following equivocal statement about the availability of lost profits damages:

> [i]f the 'damages sustained' by a victim of a RICO violation include lost profits, we see no bar in the statute to recovery of those losses. Of course, recovery of lost profits should be subject to the ordinary limitations concerning remoteness (or proximate cause) and speculativeness (or certainty).

*Id.* at 142 (quoting *DeMent v. Abbott Capital Corp.*, 589 F.Supp. 1378 (N.D.Ill.1984)). As described above, Three Crown's claims of damages sustained and the loss of the benefit of the bargain due to Defendants' manipulation are recoverable. *See Minpeco*, 676 F.Supp. 486 and 718 F.Supp. 168; *Transnor*, 736 F.Supp. 511; *Sowell v. Butcher & Singer, Inc.*, 926 F.2d 289 (3d Cir.1991). But to the extent that Three Crown's claims for Category B and Category C damages are based on investments not made or lost future profits, they lack adequate causational proof

and are speculative. The Second Circuit's decision in *In re American Express Company Shareholder Litigation*, 39 F.3d 395 (2d Cir.1994), explained that the language of RICO which grants standing to "[a]ny person injured in his business or property by reason of a violation of Section 1962 of this chapter" 18 U.S.C. § 1964(c), "limits standing to plaintiffs whose injuries were both factually and proximately caused by the alleged RICO violation." *Id.* at 399. In *First Nationwide Bank v. Gelt Funding Corp.*, 27 F.3d 763 (2d Cir.1994), the court described the purpose of the proximate cause requirement:

> Central to the notion of proximate cause is the idea that a person is not liable to all those who may have been injured by his conduct, but only to those with respect to whom his acts were "a substantial factor in the sequence of responsible causation," and whose injury was "reasonably foreseeable or anticipated as a natural consequence."

*Id.* at 769 (internal citations omitted). The *First Nationwide* court further considered the requirement of direct causation:

> The key reasons for requiring direct causation include avoiding unworkable difficulties in ascertaining what amount of the plaintiff's injury was caused by the defendant's wrongful action as opposed to other external factors, and in apportioning damages between causes.

*Id.* at 770. All of the shortcomings in Three Crown's proof of causation with respect to its Category B and C damages discussed *supra*, as to its claims under the antitrust laws and The Securities Exchange Act of 1934 apply to its claims under RICO. Accordingly, the law with respect to private RICO actions for damages precludes Three Crown from proceeding with its Category B and C claims for lost profits and lost future profits. *See also Sperber v. Boesky*, 849 F.2d 60 (2d Cir.1988) (dismissing claims for damages under RICO based upon attenuated proof of causation and noting that "the doctrine of proximate cause reflects social policy decisions based on shared principles of justice." *Id.* at 65).

For the foregoing reasons, under the standard for summary judgment articulated by the Supreme Court in *Celotex Corp. v. Catrett*, 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); and *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986), Three Crown's claims for Category B and C damages must be dismissed.

## II. *Summary Judgment with Respect to Claims of Meadowlands, L.P.*

Defendants move for summary judgment with respect to damage claims made by Plaintiff Meadowlands[28] because Meadowlands neither purchased nor sold any positions in the April or May Notes and because Meadowlands is a separate, publicly traded entity with different ownership from Three Crown. Meadowlands became involved in Three Crown's transactions only after Three Crown closed its positions on the April and May Notes. At that time, Hauptfuhrer, Horowitz and Ruttenburg discussed the remaining securities which Three Crown had purchased for its butterfly strategy and determined that they should be transferred to Meadowlands. (Wohl Aff.Exh. 2, Hauptfuhrer Dep. at 113–114, 145; Wohl Suppl. Aff.Exh. 3, Horowitz Dep. 817–818).

Meadowlands contends that its losses are recoverable because they were caused by Defendants' manipulation of the market and because Meadowlands' losses in fact were part of a reasonable effort by Three Crown to mitigate its damages. The securities received by Meadowlands were not the April or May Notes, the Notes Defendants allegedly manipulated. (Wohl Aff.Exh. 4, Horowitz Dep. at 819–822). Meadowlands was marketed publicly while Three Crown was a private fund. The transfer of the remaining positions concededly took place at market value. (Wohl Aff.Exh. 4, Horowitz Dep. at 822). The transfer was made because Hauptfuhrer and Horowitz believed that Meadowlands would profit from holding

---

**28.** As described *supra,* Meadowlands' claim is for $601,000; it represents sums lost as a result of trading on the two remaining positions of Three Crown's original butterfly strategy after the sale of all allegedly manipulated notes in June, 1991.

those securities. (Wohl Aff.Exh. 2, Hauptfuhrer Dep. at 505–507). Thus, Plaintiffs have not offered evidence that Meadowlands was caused to pay more for the securities by reason of an antitrust violation or a securities violation or by fraud. Thus, Meadowlands suffered no damage proximately caused by Defendants' conduct.

Plaintiffs seek to avoid this result by arguing that the transfer to Meadowlands constituted an effort on behalf of Three Crown to mitigate damages suffered as a result of Defendants' manipulation. In support of their mitigation argument, Plaintiffs cite *Ostano Commerzanstalt v. Telewide Systems, Inc.*, 880 F.2d 642 (2d Cir.1989), where the court considered damages for common law fraud and breach of contract. In *Ostano*, the court recognized that "[d]amages for fraud include the costs incurred in preparing for, performing, or passing up other business opportunity … as well as costs incurred in making reasonable efforts to mitigate damages." (internal citations omitted) *Id.* at 648. As set forth above, however, Three Crown would be able to recover damages for any loss it sustained in mitigating damages, but Meadowlands and Three Crown are separate entities. Meadowlands incurred no losses in Three Crown's attempt to mitigate any damages which Defendants caused it. (Wohl Suppl.Aff.Exh. 3, Horowitz Dep. 817–20, 823–24). Had the remaining positions generated profits, they would have been profitable to Meadowlands, not Three Crown. None of the cases cited by Plaintiff in support of this argument involved a situation in which a court granted recovery under the antitrust laws, securities laws, RICO, or common law theories of fraud, to a third party who suffered losses on securities or goods not the subject of the violative conduct but transferred to it by a party affected by the violative conduct. The mitigation argument fails. Plaintiff Meadowlands cannot recover losses allegedly suffered when it liquidated the positions which had been transferred to it by Three Crown after Three Crown eliminated its positions in the April and May Notes. *See Sperber v. Boesky*, 849 F.2d 60 (2d Cir. 1988) (rejecting claims of liability where "[the defendant] did not cheat or deceive plaintiffs in any way with regard to the particular stocks in question since they did not know he had purchased them and he did not trade in them illegally. He did not corner the relevant market or control the stocks in question." *Id.* at 65). As in *Sperber*, Defendants here did not manipulate or corner the market in the securities Meadowlands purchased from Three Crown; Defendants did not cause Meadowlands any injury and Meadowlands' claim for damages must be dismissed.

### III. *Preclusion of Expert Testimony of John J. McConnell*

Defendant Salomon also moves to exclude the testimony of Plaintiffs' damages expert, John J. McConnell, on the issue of Category B and C damages. Plaintiffs contend that Professor McConnell's status as a "leading academic" in the field of financial economics and his prior experience serving as a damages expert in litigation numerous times in the past render his testimony acceptable.

The Federal Rules of Evidence allow opinion testimony by experts where "scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue." Fed.R.Evid. 702. Defendant Salomon contends that the portions of McConnell's testimony which would support Three Crown's speculative damage claims should be excluded, pursuant to Federal Rules of Evidence 702, 703 and 403, because it would be "[u]nhelpful, unsupported, and highly prejudicial." (Salomon Def.Br. at 25).

In *Joy v. Bell Helicopter Textron, Inc.*, 999 F.2d 549 (D.C.Cir.1993), the D.C. Circuit reversed a damage award in a wrongful death action because it found the award to be based upon the speculative testimony of the plaintiff's expert. The court found that assumptions upon which the expert relied to formulate his opinion with respect to the decedent's likely future—by which he projected earnings the decedent could have made by entering a new line of work—"wholly speculative." *Id.* at 569. Three Crown seeks to distinguish *Joy* by arguing that McConnell is not, like the expert in *Joy*, "simply ma[king] up new lines of work" *Id.* into which Three Crown would have entered. Three Crown's

894

argument is unconvincing; McConnell's report and proposed testimony based upon it have similar problems in a different form. Instead of predicting a new line of work, McConnell purports to predict that, pursuant to a recently evolved relative value trading strategy, i.e., the butterfly strategy utilizing rollovers in three different types of securities, a future line of trades would have been entered by an investment group which, by its own admission, conducted highly leveraged discretionary trading which frequently had to be adjusted to keep pace with the rapidly changing market and that mandates ever evolving opportunities for profit and loss.

■ Professor McConnell's report describes how he arrived at his opinion with regard to the full scope of damage suffered by Plaintiffs. Beneath an intricate series of complicated calculations which yield damage figures for Categories B and C in excess of $20 million lie a series of assumptions about the markets in Treasury Notes and Securities and what trades Three Crown would have made *but for* the Defendants' manipulation. As demonstrated earlier in this opinion, McConnell's testimony with respect to Category B and C damages would rest upon numerous assumptions without the type of support required under the case law. *See also ARP Films, Inc. v. Marvel Entertainment Group, Inc.*, 952 F.2d 643 (2d Cir.1991); *Tyger Const. Co. v. Pensacola Const. Co.*, 29 F.3d 137 (4th Cir.1994) (trial court erred in admitting expert testimony which was "based on assumptions which find no support in the record." *Id.* at 144.) The *Tyger Construction* court explained that

> "although [the proposed expert's] methods are unusual, the greater danger is that the jury may accept as fact not just the faulty assumptions on which he relied, but may also accept the conclusions that are drawn through his use of these assumptions. When the assumptions made by an expert are not based on fact, the expert's testimony is likely to mislead a jury, and should be excluded by the district court."

29 F.3d at 144. McConnell's testimony regarding the conclusions he has drawn with respect to Category B and Category C damages could similarly confuse and mislead a jury. Accordingly, that testimony must be excluded as a matter of substantive law and pursuant to Rule 403 of the Federal Rules of Evidence.

IT IS SO ORDERED.